UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SHELVIN JOVAN BARNES,<br><br>*Defendant.* | Criminal Action No. 24-231 (LLA) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on Defendant Shelvin Jovan Barnes's Appeal of Order of Detention and Motion to Impose Conditions of Release. ECF No. 16. The court held detention hearings on July 29, 2024 and July 31, 2024, and denied Mr. Barnes's motion from the bench. The court now sets forth its reasoning in more detail.

## I. Background

Mr. Barnes was charged by Criminal Complaint on May 9, 2024. ECF No. 1. On May 14, 2024, he was indicted on five counts: Unlawful Possession with Intent to Distribute U-47700 and AH-7921 (Count I) and ADB-BUTINACA (Count II) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); Attempted Possession with Intent to Distribute N,N-dimethylpentylone in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846 (Count III); Possession of a Firearm in Furtherance of a Drug Trafficking Offense in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count IV); and Unlawful Possession of a Firearm due to a prior intrafamily offense, in violation of D.C. Code § 22-4503(a)(6)(A) (Count V). ECF No. 7.

The government moved for pre-trial detention before the magistrate judge. ECF No. 6. Mr. Barnes opposed, requesting that he be released to a substance abuse residential treatment program with location monitoring. ECF No. 9, at 1-2. The magistrate judge found that, although

Mr. Barnes's limited criminal history weighed against detention, the serious nature of the charged offenses, the strength of the government's evidence, and Mr. Barnes's dangerousness to the community weighed in favor of detention. ECF No. 15, at 5-6. The magistrate judge therefore granted the government's motion and detained Mr. Barnes pending trial. *Id.*

Mr. Barnes appealed the magistrate judge's decision to this court. ECF Nos. 16, 17. Initially, Mr. Barnes requested that he be released to home incarceration or home detention with a third-party custodian, as well as location monitoring under the Pretrial Services Agency's High Intensity Supervision Program. ECF No. 16, at 1. However, due to difficulties in approving the proposed third-party custodian, Mr. Barnes ultimately asked that this court release him to home incarceration or home detention with location monitoring. The government opposes Mr. Barnes's release. ECF No. 18. The court held detention hearings on July 29, 2024 and July 31, 2024. At the conclusion of the July 31 hearing, the court denied Mr. Barnes's motion, concluding that the Bail Reform Act's factors weigh in favor of his continued pretrial detention.

## II.     Legal Standard

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). The Bail Reform Act, 18 U.S.C. §§ 3141-3150, therefore presumes that an individual should be released pending trial unless the court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e); *see Salerno*, 481 U.S. at 755. The government must establish by clear and convincing evidence that the defendant is a danger to the community, *Munchel*, 991 F.3d at 1279-80, or

2

establish by a preponderance of the evidence that the defendant poses a risk of flight, *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

"That default is modified, however, for certain[] particularly dangerous defendants." *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) (quoting *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)).  In such cases, there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 1342(e)(3).  As relevant here, the presumption kicks in if the court "finds that there is probable cause to believe that the person committed . . . an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*), . . . [or] an offense under section 924(c) . . . of this title." 18 U.S.C. § 1342(e)(3).  "The presumption operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption."  *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).  Once the defendant offers such evidence, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court."  *Taylor*, 289 F. Supp. 3d at 63 (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)).

The Bail Reform Act requires the court to consider four factors, in addition to the rebuttable presumption, to determine whether any conditions of release would reasonably assure the safety of the community.  *See id.*; *see also* 18 U.S.C. § 3142(g).  Those factors are: (1) the nature and circumstances of the offense(s) charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

"[A]lthough the D.C. Circuit has not yet addressed the issue, the many circuits that have agree that the district judge should review de novo a detention decision rendered by a Magistrate Judge." *United States v. Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017) (collecting cases). "The Court is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons." *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C. 2014) (quoting *United States v. Hubbard*, 962 F. Supp. 2d 212, 215 (D.D.C. 2013)).

### III.   Discussion

Because Mr. Barnes is charged with Controlled Substances Act offenses with maximum terms of incarceration of ten years or more (Counts I-III) and an offense under 18 U.S.C. § 924(c) (Count IV), there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 1342(e)(3); *see* ECF No. 7.  Further, all four of the Section 3142(g) factors weigh in favor of Mr. Barnes's continued pretrial detention.  The court therefore denies Mr. Barnes's motion because no conditions of pretrial release "will reasonably assure the . . . safety of any other person and the community." 18 U.S.C. § 3142(e).

#### A.   Nature and Circumstances of the Offense

According to the government's proffer: in May 2024, Homeland Security agents intercepted a package that originated in China, addressed to a "Miguel Sanchez" at an address on L Street.  ECF No. 16, at 1; ECF No. 1-1, at 2.  The package contained dipentylone—a Schedule I synthetic drug that mimics the effects of amphetamines and is often sold as "molly." *See* ECF No. 1-1, at 2.  The agents removed the drugs, resealed the package, and delivered it to the L Street address.  ECF No. 16, at 1-2.  When the agents saw that the package was no longer at the residence

4

door, they knocked and Mr. Barnes answered. *Id.* at 2. Mr. Barnes admitted that he had taken the package inside. *Id.*

The agents executed a search warrant. ECF No. 16, at 2. They detained and *Mirandized* Mr. Barnes, who agreed to speak with the agents without an attorney present. ECF No. 1-1, at 1-2. He told the agents that: (1) he lived in the residence with two family members; (2) he did not know what was in the package (which agents found on the kitchen counter) "but believed it may contain 'Molly'" and "believed [it] originated from a foreign country"; (3) that he "had received several previous packages of the same drug" at his residence; and (4) that he had other drugs in his residence, including "K2" and "Booka." *Id.* at 2. Mr. Barnes identified a particular bedroom upstairs as his, and stated that there was a gun located in that bedroom. *Id.*

Agents searched the living room and found a blue plastic bin that contained "numerous items of drug paraphernalia and bulk narcotics," including ADB-BUTINACA (a Schedule I synthetic cannabinoid known as "K2" or "Spice") and a combination of AH-7921 and U-47700 (both Schedule I synthetic opioids). *Id.* One of the plastic bags that contained AH-7921 and U-47700 was labeled "BOOKA"; the other was labeled "154.25," which Mr. Barnes told agents was the weight of the drugs placed in the bag. *Id.* The plastic bin also contained various paraphernalia, including a digital scale, rubber gloves and face mask, and "[n]umerous empty plastic zipper bags . . . includ[ing] bags with numbers written on the outside in marker." *Id.* at 2-3.

The agents also found thirty-five pounds of tea leaves, approximately sixteen gallons of acetone, and "a large plastic bin containing an unknown substance." *Id.* at 5. Mr. Barnes told the agents that "the [a]cetone and tea leaves were used to mix together with drugs, and that the unknown substance in the clear bin was the end result of such a mixture." *Id.*

Agents searched the bedroom Mr. Barnes identified as his and found a Beretta 9mm pistol under the mattress. *Id.* Agents also found various personal items in the bedroom, including prescription medication bottles with Mr. Barnes's name on them, lease paperwork for the residence in Mr. Barnes's name, ten cell phones which Mr. Barnes stated were his, and another package addressed to "Miguel Sanchez" at the L Street address. *Id.* at 5-6. A search of Mr. Barnes's cell phone revealed messages suggesting that he had been dealing narcotics at least since February 2023, ECF No. 18, at 7-10, and that he was working with at least one other individual to manufacture and distribute narcotics, *id.* at 14-15.

In sum: Mr. Barnes is charged with serious crimes that involve both controlled substances and a firearm. *See* ECF No. 7. Other judges in this district have found that the combination of illegal drug distribution and possession of firearms "presents a serious danger to the community." *Taylor*, 289 F. Supp. at 64. The sheer quantity of drugs and drug paraphernalia found in Mr. Barnes's residence indicate that he has been running a large-scale drug operation. The messages on Mr. Barnes's phone suggest he has been doing so for more than a year, and with help from at least one co-conspirator. Thus, as "[a]s far as controlled-substance offenses go, the crimes charged here are significant." *United States v. Brown*, 538 F. Supp. 3d 154, 167 (D.D.C. 2021). The nature and circumstances of the offense therefore weigh in favor of detention.

### B. Weight of the Evidence

As detailed above, there is strong evidence that Mr. Barnes possessed (and attempted to possess) Schedule I controlled substances with intent to distribute. Agents recovered drugs, drug paraphernalia, and a firearm from Mr. Barnes's residence. *See* ECF No. 1-1. Mr. Barnes's own *Mirandized* statements indicated that the drug paraphernalia was used to make and distribute narcotics. *Id.* at 1-2, 5-6. The government's evidence as to Count IV of the indictment—possessing a firearm in furtherance of drug trafficking—is somewhat weaker: there is only limited

6

circumstantial evidence connecting the firearm to the drugs. *See* ECF No. 16, at 4 n.1. However, there is nonetheless strong evidence that Mr. Barnes possessed, or constructively possessed, a firearm (Count V of the indictment). Mr. Barnes identified a particular bedroom as his and told agents that there was a gun located in that bedroom. ECF No. 1-1, at 2. Agents searched the bedroom and discovered a Beretta 9mm pistol under the mattress. *Id.* at 5.

Because the weight of the evidence—particularly as to Counts I-III of the indictment—is strong, this factor weighs in favor of detention.

### C. History and Characteristics of the Defendant

In considering Mr. Barnes's history and characteristics, the court weighs his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). The court also considers "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release." *Id.* § 3142(g)(3)(B).

Mr. Barnes is thirty-two years old. ECF No. 16, at 6. He graduated in 2010 from Suitland High School and was employed at the time of his arrest. *Id.* He has a supportive network of family and friends. *Id.* Mr. Barnes states that he suffers from a substance abuse disorder, but that he has regained his sobriety while detained. *Id.* at 1.

Mr. Barnes has a limited criminal history—a factor that very much weighs in his favor. He has only one non-traffic-related criminal conviction: an April 2024 conviction for misdemeanor simple assault, resulting from a fight among family members that took place in September 2023. *Id.* at 4, 6. The family members who were involved in that incident continue to support him. *Id.* at 6; *see* ECF No. 6, at 21.

The government raises Mr. Barnes' arrest history. *See id.* at 20-22. The court "may . . . consider prior arrests or charges brought against a defendant, even when those actions did not result in convictions," *Taylor*, 289 F. Supp. 3d at 70, but many of the arrests in question here are quite dated. For example, the government emphasizes a 2015 arrest where a gun was seized—but that arrest is nearly a decade old. *See* ECF No. 6, at 20; ECF No. 18, at 16-17. The court therefore declines to "assign significant weight" to these older arrests, because they are not necessarily a strong indicator of who Mr. Barnes is today. *See Taylor*, 289 F. Supp. 3d. at 70.

Thus, looking to Mr. Barnes's criminal history and other personal characteristics in isolation, the court would find that this factor weighs against detention. However, the Bail Reform Act also requires the court to consider whether the offenses the defendant is charged with occurred while he was on probation or another form of supervised release. *See* 18 U.S.C. § 3142(g)(3)(B). And here, they did.

At the time of his arrest, Mr. Barnes was on probation for misdemeanor assault. *See* ECF No. 6, at 21. The judge in that case had prohibited him from possessing firearms. *Id.* And—perhaps most concerningly—Mr. Barnes's probation officer had conducted a home visit only two days before the arrest. *Id.* at 22. This suggests either that Mr. Barnes is able to conceal a large-scale drug operation or that he can stand up such an operation very quickly. The court is concerned that if Mr. Barnes is willing to violate the terms of his probation—especially when he is subject to home visits by his probation officer—he would not abide by the terms of pretrial release and could conceal his illicit activities from the Pretrial Services Agency.

Therefore, although Mr. Barnes's personal characteristics and limited criminal history otherwise weigh against detention, the fact that the charged conduct occurred while Mr. Barnes was on probation—in spite of and in violation of his supervision—weighs in favor of detention.

### D.   Danger to the Community

Finally, the court considers "the nature and seriousness of the danger to any person or the community that would be posed by [Mr. Barnes]'s release."  18 U.S.C. § 1342(g).  As explained above, a rebuttable presumption of danger to the community applies in this case.  *See id.* § 1342(e)(3).  The court is not persuaded that Mr. Barnes's proposed conditions of release—home incarceration or home detention at the residence of a family friend with location monitoring—would be sufficient to protect the community.  Mr. Barnes allegedly committed the charged conduct in his home, using household items and products he received in the mail.  Thus, home incarceration (particularly home incarceration without the supervision of a third-party custodian, as is proposed here) would not necessarily prevent Mr. Barnes from continued drug-trafficking. *See Taylor*, 289 F. Supp. 3d at 71 ("Congress intended that the concern for community safety reflected in the Bail Reform Act . . . encompass 'the risk that a defendant will continue to engage in drug trafficking.'" (quoting 3B Charles Alan Wright, et al., *Federal Practice and Procedure* § 766 (4th ed. 2013))).  Although Mr. Barnes proposes living in a home with others, those individuals would be under no legal obligation to supervise him because they are not his third-party custodians.  And finally, as noted above, the court is especially concerned that Mr. Barnes committed these offenses while on probation—and despite the knowledge that his probation officer would conduct home visits—and that he possessed a firearm in violation of a court order.  This suggests that Mr. Barnes may be unlikely to comply with conditions of pretrial release that are set upon him.  This factor therefore weighs in favor of detention.

### IV.   Conclusion

The court concludes that the government has demonstrated by clear and convincing evidence that Mr. Barnes's release would pose a danger to the community that no combination of release conditions currently available could reasonably mitigate.  However, if circumstances

change—for example, if Mr. Barnes identifies a suitable third-party custodian—Mr. Barnes is welcome to renew his motion.

For the foregoing reasons, the court **DENIES** Mr. Barnes's motion for pretrial release.

**SO ORDERED**.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: August 2, 2024